# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

## No. 25-2940
_____

Dakotans for Health; Rick Weiland

      Plaintiff-Appellee

v.

Monae Johnson, Secretary of State; in her official capacity only

      Defendant-Appellant

_____

Appeal from the United States District Court
for the District of South Dakota, Southern Division,
Hon. Camela C. Theeler, U.S. District Judge

_____

**<u>Brief for Appellees Dakotans for Health and Rick Weiland</u>**

James D. Leach
Attorney at Law
1617 Sheridan Lake Rd.
Rapid City, SD 57702
Tel: (605) 341-4400

## Summary of the Case

*SD Voice v. Noem*, 60 F.4th 1071, 1080 (8th Cir. 2023), held that South Dakota's one-year pre-election deadline to file a petition to initiate a statute or constitutional amendment, with all needed signatures, violated the First Amendment, because it "effectively banned [petition circulation] an entire year before the general election" for no sufficient reason. In response, the Legislature set the deadline at six months. S.D.C.L. §§ 2-1-1.1 and 2-1-1.2 (2023). But House Bill 1184 (2025) moved it back to nine months, thereby suppressing three months of core political speech, and triggering this lawsuit.

The State attempts to justify the earlier deadline by arguing that a legal challenge to a petition should be completed before the general election. But this newly-minted alleged interest does not justify the law; the State's own history, precedent, and actions contradict this newly alleged interest; and the law is grossly underinclusive, "leav[ing] appreciable damage to that supposedly vital interest unprohibited." *Fla. Star v. B.J.F.*, 491 U.S. 524, 542 (Scalia, J., concurring). The law is the latest attempt to claw political power back from citizens. Oral argument is unnecessary.

# **Table of Contents**

Statement of Issues                                                                        1

Statement of the Case                                                                      2

    1.    South Dakotans originated citizen initiatives; today citizen        2
            initiatives remain essential to their self-government

    2.    From 2012 to the present, the Legislature has fought to           4
            limit citizens' ability to bring and pass initiatives

    3.    In 2024, South Dakotans brought four initiatives, and filed       5
            two proposed initiatives to limit the Legislature's power to
            interfere with initiatives and referenda

    4.    The 2025 Legislature responds to the 2024 initiatives with        6
            HB 1184 and other attempts to defang the initiative process

    5.    Speaker of the House Jon Hansen, who introduced House             7
            Bill 1184, has long sought to limit citizen initiatives

    6.    Speaker Hansen's involvement in the Amendment G                  10
            litigation arose from his political views, not out of a
            general interest in good government—and his allegations
            remain unproven and disputed

Summary of the Argument                                                                   12

Standard of Review                                                                        20

Argument  20

I. HB 1184 violates the Freedom of Petition clause's prohibition 20
against any "law . . . abridging . . . the right of the people . . .
to petition the Government for a redress of grievances"

 A. The Freedom of Petition clause is the foundation of the 20
American system of government

 B. *SD Voice v. Noem* recognizes that an early petition filing 23
deadline implicates core political speech and the First
Amendment, and rejected the State's attempts to justify it

 C. After *SD Voice v. Noem*, South Dakota chose a six-month 27
deadline—then in 2025 set the deadline back by three
months, and invented a new alleged interest to attempt
to justify it

 D. DFH proved the same facts that plaintiffs in *SD Voice v.* 29
*Noem* proved; the State offered no contrary testimony;
and the State does not allege that the district court's
findings based on that evidence were clearly erroneous

II. South Dakota's defense rests on its newly-invented alleged 31
interest that a legal challenge to a petition be completed before
the general election—an invention at war with South Dakota's
history, actions, and precedent, and severely underinclusive

 A. South Dakota's history and precedent have allowed, or 31
even required, election challenges to be brought after an
election

Appellate Case: 25-2940 Page: 4 Date Filed: 01/02/2026 Entry ID: 5593096

B.    South Dakota's actions contradict its alleged interest in adjudicating challenges to citizen petitions before an election    34

    1.    South Dakota itself brought and succeeded in a post-election challenge to a citizen initiative in 2021    34

    2.    South Dakota disclaims any interest in challenges to citizen initiatives    37

C.    A nine-month deadline does not allow a petition challenge to be concluded before the general election, so HB 1184 is severely underinclusive    39

D.    The State's last-gasp press conference rationale was waived and lacks merit    44

E.    The State waived its rabbit hole argument that something about the 2024 Amendment G litigation somehow justifies HB 1184    45

III.    The only rational explanation for HB 1184 is the Legislature's desire to make it harder for citizens to petition for redress of grievances    47

IV.    Strict scrutiny applies; even under lesser scrutiny, HB 1184 is unconstitutional    49

A.    HB 1184's ban on three months of core political speech is more than "merely inconvenient," so strict scrutiny applies and the law is unconstitutional    49

B.    HB 1184 fails even lesser scrutiny    50

iii

Conclusion                                    51

Certificate of Compliance                     53

Certificate of Service                        53

iv

# Table of Authorities

**Constitutional provisions**

First Amendment                                        *passim*

**Statutes**

S.D.C.L. 2-1-1.1                                        14, 27

S.D.C.L. 2-1-1.2                                        14, 27

S.D.C.L. § 2-1-17.1                                     38

S.D.C.L. § 2-1-18                                       16, 37, 38

S.D.C.L. § 15-6-52(a)                                  42

**Cases**

*Barnhart v. Herseth*, 222 N.W.2d 131 (S.D. 1974)      32

*Blue Cross Blue Shield of Minn. v. Wells Fargo Bank, N.A.*, 816 F.3d 1044    20
    (8th Cir. 2016)

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011)  20

*Brendtro v. Nelson*, 720 N.W.2d 670 (S.D. 2006)       2, 21

*Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011)   18, 39

*Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182 (1999)    22, 23, 25

Appellate Case: 25-2940     Page: 7     Date Filed: 01/02/2026 Entry ID: 5593096

*Calzone v. Summers*, 942 F.3d 415 (8th Cir. 2019) (en banc) — 21

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) — 43

*Cole v. Int'l Union, UAW*, 533 F.3d 932 (8th Cir. 2008) — 44

*Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 530 (1980) — 43

*Couser v. Shelby County*, 139 F.4th 664 (8th Cir. 2025) — 18, 37

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) — 19, 49

*Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022) — 50

*Dakotans for Health v. Noem*, 543 F. Supp. 3d 769 (D.S.D. 2021) — 8

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) — 5

*Department of Commerce v. New York*, 588 U.S. 752 (2019) — 36

*Fla. Star v. B. J. F.*, 491 U.S. 524 (1989) — 39

*Goeden v. Daum*, 668 N.W.2d 108 (S.D. 2003) — 42

*Gooder v. Rudd*, 160 N.W. 808 (S.D. 1916) — 31

*John Doe No. 1 v. Reed*, 561 U.S. 186 (2010) — 23

*Kelley v. Safe Harbor Managed Account 101, Ltd.*, 31 F.4th 1058 (8th Cir. 2022) — 44

Appellate Case: 25-2940     Page: 8     Date Filed: 01/02/2026 Entry ID: 5593096

*Libertarian Party of Ark. v. Thurston*, 962 F.3d 390 (8th Cir. 2020)     25

*McDonald v. Smith*, 472 U.S. 479 (1985)     21

*Meyer v. Grant*, 486 U.S. 414 (1988)     14, 22, 23, 25-27

*Miller v. Thurston*, 967 F.3d 727 (8th Cir. 2020)     27, 50

*Roe v. Wade*, 410 U.S. 113 (1973)     5

*Roth v. United States*, 354 U.S. 476 (1957)     24

*S.D. State Fedn. v. Jackley*, 786 N.W.2d 372 (S.D. 2010)     32

*SD Voice v. Noem*, 60 F.4th 1071 (8th Cir. 2023)     *passim*

*SD Voice v. Noem*, 557 F. Supp. 3d 937 (D.S.D. 2021)     14, 28

*SD Voice v. Noem*, 432 F. Supp. 3d 991 (D.S.D. 2020), *appeal dismissed as moot* 987 F.3d 1186     8

*State v. McGarrett*, 535 N.W.2d 765 (S.D. 1995)     42

*State v. Pyle*, 226 N.W. 280 (S.D. 1929)     21

*State ex rel. Cranmer v. Thorson*, 68 N.W. 202 (S.D. 1896)     31, 43

*Thom v. Barnett*, 967 N.W.2d 261 (2021)     16, 17, 33, 35

*Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994)     28

*United States v. Cooper*, 990 F.3d 576 (8th Cir. 2021)     47

Appellate Case: 25-2940   Page: 9   Date Filed: 01/02/2026 Entry ID: 5593096

*United States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977)  37

**Other authorities**

Card, *21st Century Voter Initiatives in South Dakota*, 67 S. D. L. Rev.   2, 4, 49
    341 (2022)

Heidelberger, *Have Recent Legislative Changes in South Dakota*   2, 4, 7, 48, 49
    *Made Using the Initiated Measure Process More Difficult?*,
    70 S. D. L. Rev. 520 (2025)

*NRSC v. FEC*, No. 24-621, December 9, 2025, Alito, J., at 70,   18, 43
    available at https://www.supremecourt.gov/oral_arguments/
    argument_ transcripts/2025/24-621_q86b.pdf (last visited
    December 21, 2025)

*Trump v. Slaughter*, No. 25-332, December 8, 2025, at 45-46,   52
    available at https://www.supremecourt.gov/oral_arguments/
    argument_transcripts/ 2025/25-332_7lhn.pdf (last visited
    December 21, 2025)

Appellate Case: 25-2940     Page: 10     Date Filed: 01/02/2026 Entry ID: 5593096

## <u>Statement of Issues</u>

I.    Does House Bill 1184's abridgement of the peoples' right to petition the Government for a redress of grievances violate the First Amendment?

*SD Voice v. Noem*, 60 F.4th 1071 (8th Cir. 2023)

*SD Voice v. Noem*, 557 F. Supp. 3d 937 (D.S.D. 2021)

*Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182 (1999)

*Meyer v. Grant*, 486 U.S. 414 (1988)

II.    Does the State's newly-discovered alleged interest that a legal challenge to a petition be completed before the general election, which contradicts the State's own actions, precedent, and history, and is severely underinclusive, justify HB 1184?

*Fla. Star v. B.J.F.*, 491 U.S. 524, 542 (Scalia, J., concurring)

*Couser v. Shelby County*, 139 F.4th 664 (8th Cir. 2025)

*Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786 (2011)

*Thom v. Barnett*, 967 N.W.2d 261 (2021)

III.    What level of scrutiny applies, and can HB 1184 survive it?

*SD Voice v. Noem*, 60 F.4th 1071 (8th Cir. 2023)

Appellate Case: 25-2940    Page: 11    Date Filed: 01/02/2026    Entry ID: 5593096

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring)

## Statement of the Case

## Facts

**1. South Dakotans originated citizen initiatives; today citizen initiatives remain essential to their self-government**

In 1898, South Dakota became the first state to authorize a novel experiment in democratic self-government: allowing citizens to petition to create laws, then to gather signatures to place those proposed laws on the ballot, so that if approved by a majority, they become law. *Brendtro v. Nelson*, 720 N.W.2d 670, 677 n.4 (S.D. 2006). In 1972, South Dakotans authorized themselves to amend the constitution the same way. Card, *21st Century Voter Initiatives in South Dakota*, 67 S. D. L. Rev. 341, 342 (2022). South Dakotans have used these processes more than a hundred times. Heidelberger, *Have Recent Legislative Changes in South Dakota Made Using the Initiated Measure Process More Difficult?*, 70 S. D. L. Rev. 520, 524 (2025).

Appellate Case: 25-2940     Page: 12     Date Filed: 01/02/2026 Entry ID: 5593096

Successful recent South Dakota citizen initiatives include:

- a health care patients' rights law in 2014 (Initiated Measure 17);

- a minimum wage law in 2014 (Initiated Measure 18);

- a crime victims' rights law in 2016 (Constitutional Amendment S);

- a law regulating payday lending in 2016 (Initiated Measure 21);

- campaign finance and lobbying laws in 2016 (Initiated Measure 22);

- medical marijuana legalization in 2020 (Initiated Measure 26);

- recreational marijuana legalization the same year (Constitutional Amendment A); and

- Medicaid expansion in 2022 (Constitutional Amendment D).

Appellate Case: 25-2940    Page: 13    Date Filed: 01/02/2026 Entry ID: 5593096

Supp. App. 852-56; R. Doc. 55, at 196-200.

## 2. From 2012 to the present, the Legislature has fought to limit citizens' ability to bring and pass initiatives

The initiative process gives citizens direct power to make laws. In recent years, elected officials have sought, in a death-by-a-thousand-cuts strategy, to take much of that power back from citizens. A 2022 law review article examined "the legislative attempts over the last ten years to limit the initiative process via legislative and constitutional changes to the initiative process." Card, *supra*, 67 S. D. L. Rev. at 342. A 2025 law review article explained that "Between 2017 and 2024, the legislature passed dozens of bills related to the regulation of the initiated measures that have been signed into law by the Governor. Almost all of them were introduced to limit or stifle access to the initiative measure and referendum process." Heidelberger, *supra*, 70 S. D. L. Rev. at 525.

4

### 3. In 2024, South Dakotans brought four initiatives, and filed two proposed initiatives to limit the Legislature's power to interfere with initiatives and referenda

South Dakotans qualified four initiatives for the 2024 ballot. Dakotans for Health brought two of them. One was Amendment G, an initiated constitutional amendment to restore the right to reproductive choice that existed from *Roe v. Wade*, 410 U.S. 113 (1973), until *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). The second was an initiated law to eliminate the state sales tax on groceries. Other groups brought two more measures. One would have amended the South Dakota Constitution by establishing a top-two system for primary elections. The other would have legalized recreational marijuana. JApp. 625-26.

After the 2024 election, Dakotans for Health filed two proposed initiatives to restore citizen power in the initiative process. DFH currently circulates both. One would amend the South Dakota Constitution to provide: "Any law or measure passed by the Legislature affecting the people's exercise of their right to initiative and referendum is effective only if approved by the

electors of the state at the general election immediately following Legislative passage." JApp. 631; Supp. App. 824; R. Doc. 55, at 9.

The other would amend the South Dakota Constitution to provide: "The Legislature may not repeal or amend a measure proposed by the people and approved by the electors for seven years from the measure's effective date, except by a three-fourths vote of the members elected to each house, and only if the repeal or amendment is approved by the electors of the state at the general election immediately following Legislative passage." JApp. 631; Supp. App. 825; R. Doc. 55, at 10.

### 4. The 2025 Legislature responds to the 2024 initiatives with HB 1184 and other attempts to defang the initiative process

The 2025 Legislature struck back. It "proposed twelve measures—seven bills, five constitutional amendments—affecting the ballot measure process." Ten of the twelve "work against initiatives and/or referendum by increasing signature requirements, banning paid circulators, reducing the time to circulate petitions, increasing the vote threshold for voters to pass amendments, restricting the subjects of ballot measures, or expanding the

6

legal ground for rejecting petition signatures."  Heidelberger, *supra*, 70 S.D. L. Rev. at 547-48.  The measure "reducing the time to circulate petitions" is HB 1184.  Add. 1; JApp. 100; R. Doc. 7-2.

### 5. Speaker of the House Jon Hansen, who introduced House Bill 1184, has long sought to limit citizen initiatives

Speaker of the House Jon Hansen introduced House Bill 1184.  Add. 1; JApp. 100; R. Doc. 7-2.  Speaker Hansen has an unparalleled record of attempts to limit the citizen initiative process:

- In 2019 he was the prime House sponsor of HB 1093, which makes petition challenges easier.  Supp. App. 860-63; R. Doc. 55, at 204-07.  The bill was enacted.  https://sdlegislature.gov/Session/Bill/9983 (last visited December 20, 2025).

- In 2019 he was the prime House sponsor of HB 1094.  Supp. App. 864-65; R. Doc. 55, at 208-09.  It was enacted, but held unconstitutional as violating the First Amendment.  *SD*

7

*Voice v. Noem*, 432 F. Supp. 3d 991 (D.S.D. 2020), *appeal dismissed as moot* 987 F.3d 1186.

- In 2020 he was the prime House sponsor of SB 180. Supp. App. 866-67; R. Doc. 55, at 210-11. It was enacted, but preliminarily enjoined as unconstitutional as violating the First Amendment. *Dakotans for Health v. Noem*, 543 F. Supp. 3d 769 (D.S.D. 2021). The preliminary injunction was upheld on appeal. 52 F.4th 381 (8th Cir. 2022). On remand, the State stipulated to a permanent injunction. Supp. App. 857-59; R. Doc. 20-21, at 201-03.

- In 2021 he sponsored SB 77, which requires the text of initiatives to be printed in 14-point font, making petitions physically bulkier. The bill was enacted. Supp. App. 868-69; R. Doc. 55, at 212-13.

- In 2021 he was the prime House sponsor of House Joint Resolution 5003, which proposed a constitutional

8

amendment to increase from 50% to 60% the number of votes needed to approve ballot measures that impose taxes or fees or obligate over $10 million. The Legislature adopted it. Supp. App. 870-72; R. Doc. 55, at 214-16. Voters rejected it. Supp. App. 856; R. Doc. 55, at 200.

- In 2024 he was the prime House sponsor of HB 1244, which allowed voters who sign a ballot petition to later withdraw their signatures. The bill was enacted. Supp. App. 873-75; R. Doc. 55, at 217-19.

In 2025, now having risen to Speaker of the House, Representative Hansen sponsored and the Legislature passed additional measures to make citizen initiatives harder or impossible:

- He co-sponsored HB 1169, which would have crippled citizen-initiated constitutional amendments by requiring that a petition include signatures from at least five percent of the total votes cast for Governor in each of South

Dakota's 35 legislative districts.  Supp. App. 877-882; R. Doc. 55, at 221-26.  The Legislature passed the bill. The Governor vetoed it.  Supp. App. 878; R. Doc. 55, at 878.  The Governor's veto message explains why the bill was likely unconstitutional.  Supp. App. 883-84; R. Doc. 55, at 227-28.

- He was the prime sponsor of HB 1256, which complicates the initiative petition process, creates more grounds for rejecting petition signatures, and bans circulators from correcting petition signer errors.  The Legislature enacted it. Supp. App. 885-89; R. Doc. 55, at 229-33.

- He introduced HB 1184, the subject of this lawsuit.  Add. 1; JApp. 100; R. Doc. 7-2.

**6.   Speaker Hansen's involvement in the Amendment G litigation arose from his political views, not out of a general interest in good government—and his allegations remain unproven and disputed**

Even before DFH began seeking signatures for Amendment G in November 2022 to qualify it for the 2024 ballot, Speaker Hansen announced

10

his implacable opposition to it, and his plan to confront and challenge petition circulators. Hansen wrote: "Beginning this November, we must stand next to their petition circulators, explain to the public how radical this amendment is, and encourage our fellow citizens not to sign the petition." Supp. App. 876; R. Doc. 55, at 220. He wrote: "We're up against a lot, but if we work together and contribute what we can, we can prevail. Your donation at www.lifedefensefund.com will be used to fund this resistance campaign at every single step of the way." *Id.*

Litigation was part of his strategy. He promised to "sue them when they break our campaign finance and petition circulation laws." *Id.* Hansen testified that his opposition to Amendment G was motivated by his political views. JApp. 756-58. All this was Hansen's right. But it is a far cry from the story the State tells that his efforts against Amendment G were part of a generalized "duty and commitment to transparency." State's Brief at 14.

DFH immediately disputed Hansen's allegations, and challenged his campaign of intimidation and harassment against petition circulators. Supp.

11

App. 890; R. Doc. 55, at 279.  No agency or official took any action based on

any of Hansen's allegations.  Hansen conceded that no court ever heard or

resolved any of them:

> Q.    So the allegations in your complaint, which
>        were denied by Dakotans for Health, were
>        never heard and resolved by any court, were
>        they?
>
> A.    [Speaker Hansen] That's correct.
>
> JApp. 789, lines 19 to 22.

## Procedural history and ruling presented for review

Plaintiffs sought a permanent injunction against HB 1184 on the ground

that it violated the First Amendment.  After a trial, the district court agreed

and issued a permanent injunction.  The only issue is whether the district

court erred in doing so.

## Summary of the Argument

Our federal system allows every state to be a laboratory of democracy.

In 1898, South Dakota began an experiment in democracy that shines stronger

12

than ever today: allowing citizens to petition to change their laws and constitution, and with enough signatures, to qualify to vote to enact those changes.

Citizen use of initiatives crescendoed in South Dakota in 2024. Citizens qualified four initiatives for the general election on highly controversial topics, including abortion, sales tax, primary elections, and marijuana. Speaker Hansen led a court challenge to proposed Amendment G, the abortion initiative. Before 2024 was over, Dakotans for Health proposed two initiated measures to expand citizens' initiative and referendum rights. Supp. App. 824-25; R. Doc. 55, at 9-10.

In 2025, Speaker Hansen and the Legislature fought back. They proposed ten laws to restrict citizen ballot measures. One such law was House Bill 1184, which re-addressed an issue that this Court decided in *SD Voice v. Noem*, 60 F.4th 1071 (8th Cir. 2023). *SD Voice v. Noem* held unconstitutional South Dakota's one-year pre-election deadline to file initiated measures with all needed signatures. This Court ruled that the one-

13

year deadline violated the First Amendment because it effectively suppressed petition circulation—"core political speech" under *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988)—for far longer than justified by any legitimate state interest.

After this Court decided *SD Voice v. Noem*, the 2023 Legislature established the new deadline.  The district court that tried the case had ruled that the maximum permissible deadline was six months before the election. *SD Voice v. Noem*, 557 F. Supp. 3d 937, 948 (D.S.D. 2021) ("a filing deadline of six months before the election at which the initiative would receive a vote is the constitutional limit for how remote a deadline may be set from the election.")  The Legislature set the new deadline as six months.  S.D.C.L. §§ 2-1-1.1 and 2-1-1.2 (2023).  Plaintiffs were satisfied and dismissed their case as moot.

All was well until 2025, when the Legislature in HB 1184 took another bite at the deadline apple, moving it back to nine months before the election, and thereby suppressing three months of core political speech.  The State

14

attempts to justify HB 1184 by fabricating a new alleged state interest that it has never before asserted: that a challenge to an initiative petition, like the one Speaker Hansen brought in 2024, be completed before the election.

This new alleged interest is suspect from the get-go, because the State made no mention of it in *SD Voice v. Noem*. It is highly implausible that a significant interest completely escaped the State's awareness just two years ago.

Be that as it may, for multiple additional reasons the new alleged interest does not justify suppressing three months of core political speech. First, the South Dakota Supreme Court in a series of cases from 1896 to 2021 has always allowed, and sometimes even required, election challenges to be brought *after* an election, not before it. So the newly-discovered alleged interest is foreign to South Dakota law.

Second, in 2021, South Dakota itself, acting through its Governor, who was acting in her official capacity, brought a *post*-election challenge to a citizen initiative the voters had adopted. The State could have challenged the

15

initiative before the election. The citizens argued the State had forfeited its right to bring the challenge by waiting until after the election. The State disagreed, arguing that a post-election challenge was perfectly proper. The South Dakota Supreme Court agreed with the State, heard the case on its merits, and ruled the initiative void. So South Dakota itself, in the 2021 litigation, explicitly rejected the State's current alleged interest. *Thom v. Barnett*, 967 N.W.2d 261, 271-72 (2021).

Third, the 2018 South Dakota Legislature disclaimed any State interest in litigating private petition challenges, by re-writing the statute that allows such challenges to bar the Attorney General from participating in them, except for the extremely limited purpose of "the process of signature verification by the Office of the Secretary of State under chapter 2-1." S.D.C.L. § 2-1-18. So the State cannot play any part in litigating private petition challenges. If the State actually recognized an interest in seeing that such challenges are completed before the general election, it would want the

16

Attorney General to appear and emphasize the State's supposed interest in a pre-election decision.

Finally, HB 1184 is grossly mismatched to its alleged purpose of ensuring that petition challenges are resolved before the election. The State conceded, and the district court found, that the nine-month deadline "may or may not" accomplish its alleged goal. Add. 17-18; JApp. 466-67; R. Doc. 68, at 14-15. The 2024 court challenge that Speaker Hansen led to Amendment G proved this, because trial of the case would not have been concluded until more than three months *after* the election, so starting three months sooner would not have produced even a trial court decision before the election. And as the district court found, even if a challenger received a trial court decision before the election, the losing party's appeal to the South Dakota Supreme Court would leave the case unresolved until long after the election. Add. 15; JApp. 464; R. Doc. 68, at 12. This is just what occurred in *Thom v. Barnett*, *supra*, 967 N.W.2d 261, which was decided more than a year *after* the election.

17

"One of the reasons for heightened scrutiny is to ferret out whether the asserted reason for a challenged law or provision is actually the real reason for the provision." *NRSC v. FEC*, No. 24-621, December 9, 2025, Alito, J., at 70, available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/24-621_q86b.pdf (last visited December 21, 2025). Plainly the asserted reason for HB 1184 is not the real reason for it. *Couser v. Shelby County*, 139 F.4th 664, 670 (8th Cir. 2025) ("This court looks beyond the rationale offered to evidence of the law's purpose.")

A law's "underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011). HB 1184 disfavors citizens' core political speech on behalf of initiated measures.

Just as the State's alleged interests in *SD Voice v. Noem* failed to justify a one-year pre-election deadline, its newly-discovered alleged interest fails to justify a nine-month deadline. HB 1184's alleged rationale is contradicted by

18

South Dakota's history and precedent, and by the State's own actions. And HB 1184's severe underinclusiveness undermines the State's story of its purpose.

The only plausible rationale for HB 1184 is that it is one more in the Legislature's long history of attempts to take political power back from citizens. People have struggled over political power since the beginning of time. But the First Amendment constrains the State's ability to suppress citizens' core political speech to favor the Legislature's political goals.

Unless HB 1184 is a "merely inconvenient" limit on freedom of speech, strict scrutiny applies. *SD Voice v. Noem*, 60 F.4th at 1080, quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring) (citation omitted). The nine-month deadline is more than "merely inconvenient"; it bans three months of core political speech as petition circulators are racing to qualify their petitions for the ballot. *SD Voice v. Noem*, 60 F.4th at 1080, states: "we harbor doubt that the burden on the ability to engage in political speech as a result of the [one-year] deadline is less than

19

severe." But this Court did not reach this issue, because the deadline failed even lesser *Anderson/Burdick* scrutiny. The same is true here.

## Standard of Review

The district court's factual findings are reviewed for clear error. *SD Voice v. Noem*, 60 F.4th 1071, 1077 n.3 (8th Cir. 2023). Its conclusions of law are reviewed *de novo*. *Blue Cross Blue Shield of Minn. v. Wells Fargo Bank, N.A.*, 816 F.3d 1044, 1048 (8th Cir. 2016). The district court's grant of a permanent injunction is reviewed for abuse of discretion. *SD Voice v. Noem*, 60 F.4th at 1077.

## Argument

I.  **HB 1184 violates the Freedom of Petition clause's prohibition against any "law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances"**

A.  **The Freedom of Petition clause is the foundation of the American system of government**

"Petition, as a word, a concept, and an essential safeguard of freedom, is of ancient significance in the English law and the Anglo-American legal tradition." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 395 (2011). The Magna

20

Carta itself "was King John's answer to a petition from the barons." *Id.* The right to petition is essential to our system of government of the people, by the people, and for the people.

"The right to petition is in some sense the source of other fundamental rights, for petitions have provided a vital means for citizens to request recognition of new rights and to assert existing rights against the sovereign." *Id.* at 397. Indeed, the right to petition "is implicit in the very idea of government, republican in form." *Calzone v. Summers*, 942 F.3d 415, 425 (8th Cir. 2019) (en banc), quoting *McDonald v. Smith*, 472 U.S. 479, 482 (1985). In South Dakota, "'[t]he [Legislature's] power is only concurrent with the power of the people to initiate a law on any subject.'" *Brendtro v. Nelson*, 720 N.W.2d 670, 680 (S.D. 2006), quoting *State v. Pyle*, 226 N.W. 280, 281 (S.D. 1929) (alterations in *Brendtro*).

South Dakotans make robust use of their petition power. Recent successful petition initiatives include health care rights, Medicaid expansion, crime victims' rights, minimum wage increases, payday lending restrictions,

21

campaign finance and lobbying regulation, and medical and recreational marijuana laws. Other measures failed, as they will in any competitive political system. Supp. App. 829-56; R. Doc. 55, at 173-200. Even measures that fail are South Dakotans' exercise of their right to petition their government for political change—the heartbeat of a living democracy. Failed initiatives expose people to new ideas and the possibility of change. Many ideas fail before they succeed. Today's failures may become tomorrow's orthodoxies.

The right to petition requires the right to circulate a petition, which is core First Amendment expression. *Meyer v. Grant*, 486 U.S. 414, 421 (1988) ("The circulation of an initiative petition of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change.") First Amendment protection for petition circulation is "at its zenith," because petition circulation is "core political speech" that "involves 'interactive communication concerning political change.'" *Buckley*

22

*v. Am. Constitutional Law Found.*, 525 U.S. 182, 186-87 (1999), quoting *Meyer v. Grant*, 486 U.S. at 422, 425.

South Dakota's regulation of the petition process "must satisfy the First Amendment." *SD Voice v. Noem*, 60 F.4th at 1082, citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 195 (2010) ("The State, having chosen to tap the energy and the legitimizing power of the democratic process, must accord the participants in that process the First Amendment rights that attach to their roles.")

**B. *SD Voice v. Noem* recognizes that an early petition filing deadline implicates core political speech and the First Amendment, and rejected the State's attempts to justify it**

*SD Voice v. Noem*, 60 F.4th 1071 (8th. Cir. 2023), held that South Dakota's one-year pre-election filing deadline for petitions to initiate a law or a constitutional amendment violated the First Amendment. This Court explained that the one-year deadline "implicates th[e] principles" that signing a petition expresses a political view; that petition circulation is core political speech under *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186 (1999); and that "the First Amendment is designed 'to assure unfettered interchange

23

of ideas for the bringing about of political and social changes desired by the people.'" 60 F.4th at 1078, quoting *Roth v. United States*, 354 U.S. 476, 484 (1957).

*SD Voice v. Noem* recognizes that an early filing deadline restricts the core political speech of petition circulation in multiple ways:

- The deadline "effectively prohibits circulating petitions" after that date. 60 F.4th at 1078.

- An early deadline "make[s] it less likely that [plaintiff] will garner the number of signatures necessary to place a matter on the ballot, thus limiting its ability to make its political causes the focus of statewide discussion." 60 F.4th at 1078 (cleaned up).

- "It is common sense that cabining core political speech in the form of petition circulation to a period no closer than a year before an election would dilute the effectiveness of the speech." 60 F.4th at 1078.

24

- "[D]eadlines far before election day are problematic because of the general disinterest of potential voters so far removed from elections."  60 F.4th at 1080, quoting *Libertarian Party of Ark. v. Thurston*, 962 F.3d 390, 400 (8th Cir. 2020).

In *SD Voice v. Noem*, the State attempted to justify the one-year deadline by pointing to three alleged interests: "election integrity, administrative efficiency, and the Legislature's ability to respond to petitions."  60 F.4th at 1080.  This Court carefully examined each and found none supported the one-year deadline.  This Court summarized: "South Dakota's filing deadline of one year before a general election 'imposes a burden on political expression that the State has failed to justify.' *Buckley*, 525 U.S. at 195 (quoting *Meyer*, 486 U.S. at 428).  In other words, South Dakota failed to provide evidence connecting the one-year deadline to its asserted interests."  60 F.4th at 1082.

In this appeal, South Dakota makes two arguments identical to arguments it made, and this Court rejected, in *SD Voice v. Noem*.  First, the State argued in *SD Voice v. Noem* that regardless of the early filing deadline,

25

"its citizens are still 'free to propose an initiated measure of their choosing and to convey their message to all who will listen.'" 60 F.4th at 1079. The State's identical argument in this appeal is that citizens "retain vast opportunities to share their political message despite the petition filing deadline imposed under HB 1184." State's Brief at 18. But this Court rejected that argument, stating: "South Dakota's observation speaks to the degree of burden rather than the existence of a burden. The Supreme Court has rejected the argument that a statute's burden on expression 'is permissible because other avenues of expression remain open,' reasoning a law that leaves open other avenues of communication does not relieve the burden on protected political discourse. *Meyer* [*v. Grant*], 486 U.S. at 424. So too here." 60 F.4th at 1079.

Second, the State argued in *SD Voice v. Noem* that the one-year deadline was insignificant, citing evidence of previous successful petitions despite the early filing deadline. The State's identical argument in this appeal is that "Given this number of considered ballot initiatives, the one-year [sic] deadline

26

for petitions prior to the election does not appear to create a severe burden." State's Brief at 18. But this Court already rejected this argument, stating "the number of petitions that made it onto the statewide ballot decreased from 2016 to 2020"—and concluding that "[o]n this record and under *Meyer [v. Grant*, 486 U.S. 414 (1988)] and *Miller* [*v. Thurston*, 967 F.3d 727 (8th Cir. 2020)], we agree with the district court that South Dakota's filing deadline under South Dakota Codified Laws § 2-1-1.2 implicates the First Amendment." 60 F.4th at 1079.

### C. After *SD Voice v. Noem*, South Dakota chose a six-month deadline—then in 2025 set the deadline back by three months, and invented a new alleged interest to attempt to justify it

This Court in *SD Voice v. Noem* reversed the district court having set the deadline as six months before the general election, because setting the new deadline was up to the Legislature. 60 F.4th at 1083. The Legislature set the new deadline as six months. S.D.C.L. §§ 2-1-1.1 and 2-1-1.2 (2023). This wasn't surprising, because the district court had already held, after a trial, that in light of South Dakota's election system, "a filing deadline of six months

27

before the election at which the initiative would receive a vote is the constitutional limit for how remote a deadline may be set from the election." *SD Voice v. Noem*, 557 F. Supp. 3d 937, 948 (D.S.D. 2021).

Nonetheless, the 2025 Legislature set the deadline back to nine months. In attempting to justify this, the State jettisons the three alleged interests it asserted in *SD Voice v. Noem*, and instead hitches its star to a newly-discovered alleged interest in "allowing adequate time for meaningful court challenges to potentially invalid petitions[.]" State's Brief at 19.

But from 1898 to the present, the State never claimed such an interest. Even the State's arguments in *SD Voice v. Noem* contain nary a peep about it. *SD Voice v. Noem*, 60 F.4th at 1080 ("South Dakota argues its interests are sufficient to justify the restrictions. As best we can tell, South Dakota offers three distinct interests: election integrity, administrative efficiency, and the Legislature's ability to respond to petitions.")

The First Amendment requires careful scrutiny of the State's newly-discovered alleged interest. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994)

28

(plurality) ("When the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. [. . . ] It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.") (citation modified).

**D.    DFH proved the same facts that plaintiffs in *SD Voice v. Noem* proved; the State offered no contrary testimony; and the State does not allege that the district court's findings based on that evidence were clearly erroneous**

At trial, Dakotans for Health proved the same facts that the plaintiffs in *SD Voice v. Noem* proved.  JApp. 633-36 and 675-85.  This included "detailed testimony to support that the three-month change in the deadline created by HB 1184 negatively impacts Dakotans for Health's ability to organize a petition drive and obtain signatures for a measure to be placed on a ballot," Add. 8; JApp. 457; R. Doc. 68, at 5; that "[t]he State cannot reasonably dispute that [the] new filing deadline 'limits the number of voices that will convey a message on the ballot by pushing back the deadline' to nine months before the

29

election," Add. 13; JApp. 462; R. Doc. 68, at 10; "that petition circulation 'is effectively banned' for nine months before the general election," Add. 13; JApp. 462; R. Doc. 68, at 10; and that "a deadline farther away from an election 'makes it less likely that [a ballot committee] will secure the number of signatures necessary to place the matter on the ballot, thus limiting the ability to advance statewide discussion on political issues.'" Add. 13-14; JApp. 462-63; R. Doc. 68, at 10-11, quoting *SD Voice v. Noem*, 60 F.4th at 1080 (brackets by district court).

The State offered no contrary testimony, and it does not contend that the district court erred in any of these findings, so it waived any such argument. *SD Voice v. Noem*, 60 F.4th at 1077 n.3 ("In its opening brief, South Dakota does not argue the district court's factual findings are clearly erroneous. Accordingly, South Dakota has waived any argument challenging the factual findings.")

Appellate Case: 25-2940    Page: 40    Date Filed: 01/02/2026 Entry ID: 5593096

**II.     South Dakota's defense rests on its newly-invented alleged interest that a legal challenge to a petition be completed before the general election—an invention at war with South Dakota's history, actions, and precedent, and severely underinclusive**

**A.     South Dakota's history and precedent have allowed, or even required, election challenges to be brought after an election**

South Dakota from 1889 to the present has allowed or required election challenges to be brought after an election.  And it still does.

*State ex rel. Cranmer v. Thorson*, 68 N.W. 202 (S.D. 1896), was a pre-election attempt to preclude citizens from voting on a proposed amendment to the South Dakota Constitution.  The court ruled it had no power to decide the issue until after the election.  So voters went to the polls without knowing whether the proposed amendment was lawful.  This is the exact result the State now labels as unacceptable and claims it sought to rectify with HB 1184.  State's Brief at 19 (bottom four lines) and 21 (lines 2-4).

*Gooder v. Rudd*, 160 N.W. 808 (S.D. 1916), was a post-election challenge seeking to declare a municipal election void on the ground that too few qualified people signed the election petition.  The challengers could have sued

31

before the election, but did not.  They could have contested the election, but did not.  Instead, the challengers sued after the election.  The court agreed the challenge was proper and held the election void.  Again, the voters went to the polls without knowing whether the proposed amendment was lawful.

*Barnhart v. Herseth*, 222 N.W.2d 131 (S.D. 1974), was a post-election challenge to a constitutional amendment.  The challenge could have been brought before the election.  The case does not even hint that the challenge was brought too late.  Once again, the voters went to the polls not knowing whether the amendment would be allowed or not.

*S.D. State Fedn. v. Jackley*, 786 N.W.2d 372, 376 (S.D. 2010), was a pre-election challenge to the legality and constitutionality of a proposed constitutional amendment before an election.  The court refused to decide the issue, holding that it could only be brought *after* the election.  "Until then" it was "up to the people of South Dakota, and not the courts, to weigh the evidence and decide on the wisdom and utility of the issue."  *Id.*  So once

Appellate Case: 25-2940     Page: 42     Date Filed: 01/02/2026 Entry ID: 5593096

again, citizens voted without knowing whether what they voted on was constitutional.

Finally, *Thom v. Barnett*, 967 N.W.2d 261 (S.D. 2021), was a post-election challenge brought after voters approved an initiated constitutional amendment. It held that the approved constitutional amendment was unconstitutional and void. Again, the court was unconcerned that citizens voted without knowing whether the proposal was constitutional or not.

HB 1184 does not change South Dakota law that an election challenge may, or in some cases must, be brought *after* an election. The Legislature has never attempted to limit in any way the rule that an election challenge may be brought after an election. So—regardless of the outcome of this appeal—election challenges in South Dakota can still be brought after the election is over. And regardless of the outcome of this appeal, South Dakota voters will continue going to the polls without knowing whether anyone will sue arguing that the results of the election should be nullified, and if so, what the result of that lawsuit may be.

33

In short, reality eviscerates South Dakota's claim that it has an "important, if not compelling" interest that a legal challenge to a petition is completed before the general election. State's Brief at 19. Firmly established South Dakota precedent shows that it has no such interest. *SD Voice v. Noem*, 60 F.4th at 1082, rejected the State's justifications for a one-year filing deadline as insufficiently connected to its interests. This Court should reject the State's recently-invented alleged justification for a nine-month filing deadline as unconnected to its actual interests, as evidenced by the State's unbroken history over more than a century of allowing post-election challenges.

**B.** **South Dakota's actions contradict its alleged interest in adjudicating challenges to citizen petitions before an election**

**1.** **South Dakota itself brought and succeeded in a post-election challenge to a citizen initiative in 2021**

The most recent of the cases cited above was brought by South Dakota itself. In 2020, after an initiated constitutional amendment to legalize recreational marijuana succeeded, the State sued to hold the initiative void—and won.

34

The case was *Thom v. Barnett*, 967 N.W.2d 261 (2021). After the initiative passed with 54% of the vote, two South Dakota officials sued to invalidate it on the ground that it violated South Dakota's single-subject rule—an alleged defect apparent from the time it was first proposed. The court held that neither plaintiff had standing—but that the case could proceed because the South Dakota Governor, after the litigation was filed, issued an Executive Order "in her official capacity" that she had authorized it. So the State itself was the real party in interest and the case could proceed. 967 N.W.2d at 271-72.

The *Thom* defendants argued that because the case could have been brought before the election, it was untimely. *Thom* soundly rejected their contention: "Proponents' identification of other legal remedies that may have been available before the election does not mean these remedies were exclusive. . . . [W]e have previously considered post-election challenges where the defects were known and could have been addressed before the election.

35

[citation omitted]  We therefore reject Proponents' claim that this action is untimely."  967 N.W.2d at 272.

So South Dakota itself brought and succeeded in a recent post-election challenge to a successful initiative, and obtained the South Dakota Supreme Court's endorsement that such challenges may be brought after the election.

What to make, then, of South Dakota's current claim that it has an interest in ensuring that a challenge to an initiative be concluded *before* an election—and that its interest is sufficiently great to justify suppressing three months of core political speech?  Actions always speak louder than words. The State's actions discredit its words.  The State having recently used post-election litigation to achieve its ends discredits its claim that—all of a sudden, just in the nick of time to try to justify HB 1184—it abhors this.

*Department of Commerce v. New York*, 588 U.S. 752 (2019), refused to allow the government to include a citizenship question on the 2020 Census, because statements by proponents showed that the government's litigation argument "seems to have been contrived."  *Id*. at 784.  The facts "t[old] a story

36

that [did] not match" the government's argument.  Judicial review is "more than an empty ritual[.]" *Id*. at 785.  The Court would not "ignore the disconnect between the decision made and the explanation given." *Id*.  Even under deferential review, a court is "not required to exhibit a naiveté from which ordinary citizens are free." *Id.*, quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.).

Judges are not potted plants. *Couser v. Shelby County*, 139 F.4th 664, 670 (8th Cir. 2025) ("This court looks beyond the rationale offered to evidence of the law's purpose.")  The State's argument cannot be squared with the facts.

### 2. South Dakota disclaims any interest in challenges to citizen initiatives

In 2018, the Legislature re-wrote the statute that allows pre-election petition challenges.  The rewritten law prohibits the South Dakota Attorney General from participating in such a challenge except for the very limited purpose of "the process of signature verification by the Office of the Secretary of State under chapter 2-1."  S.D.C.L. § 2-1-18.  The Legislature thereby got

South Dakota out of the business of challenges to citizen initiatives, outsourcing such matters to private individuals.

Challenges authorized by S.D.C.L. § 2-1-18 are broad; they include allowing "any interested person" to challenge "the validity of any signature, the veracity of the petition circulator's attestation," or "any other information required on a petition by statute or administrative rule, including any deficiency that is prohibited from challenge under § 2-1-17.1." But after 2018 the State cannot be any part of litigating such issues, which is now entirely a private affair. The State acknowledges that "citizen challenges are the sole mechanism for questioning petitions in their entirety." State's Brief at 13.

The Legislature's removal of the State from petition challenge litigation refutes the State's argument that it has a critical interest in ensuring that such challenges are completed before the general election. If the State actually recognized such an interest, it would want the Attorney General to appear and to push the litigation forward, in light of the State's (alleged) interest in prompt resolution. But the State has gagged itself by precluding its Attorney

38

General from making any such argument. So the State has eschewed any interest in the petition litigation process that it now claims justifies HB 1184.

## C. A nine-month deadline does not allow a petition challenge to be concluded before the general election, so HB 1184 is severely underinclusive

A law's underinclusiveness "raises serious doubts" about whether a state "is, in fact, servicing, with [a] statute, the significant interests" that it says justify it. *Fla. Star v. B. J. F.*, 491 U.S. 524, 540 (1989). Or to put it slightly differently, a law cannot "justify[] a restriction upon truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited." *Id.* at 542 (Scalia, J., concurring). "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

In this case, South Dakota's suppression of three months of core political speech survives only if it is justified by a sufficiently important state interest. The State conjures up an alleged need to conclude a petition challenge before

39

the general election. But the nine-month deadline to end petition circulation cannot possibly accomplish that goal, so it is substantially underinclusive.

Litigation to resolve a petition challenge in South Dakota is unlikely to be completed before an election, regardless of whether it begins after a petition is submitted in early May as current law requires, or early February as HB 1184 requires. Months can be consumed by depositions, motions, briefing, scheduling, trial, and decision—and then the losing party appealing the trial court decision to the South Dakota Supreme Court. Three separate reasons confirm this.

First, the State conceded this and the district court found it was true. Add. 17-18; JApp. 466-67; R. Doc. 68, at 14-15 ("The nine-month deadline simply allows for three more months of litigation that may or may not result in a final resolution before an election. The State acknowledges as much. *See* Docket 25 at 23 (noting that the ability to bring a petition challenge earlier 'would have *potentially* allowed the trial in the Amendment G matter to occur in October, prior to the election, rather than January, after the election.')

40

(emphasis added by district court)."  In this appeal, the State reiterates its concession that a nine-month deadline would only have "potentially" allowed the Amendment G trial (but certainly not the appeal) to occur before the election.  State's Brief at 16.

Second, the petition challenge to Amendment G, which was the focus of the State's attempt to justify HB 1184, proves this is true.  The challengers included an organization co-chaired by Speaker Hansen, and Speaker Hansen was one of its attorneys.  They filed their case on June 13, 2024.  JApp. 493. Over the next six months, they sent written discovery, took depositions, filed a 478-page motion for summary judgment, and billed 995 hours. JApp. 489-90 and 521.  The trial was eventually scheduled to begin on Monday, January 27, 2025, and last through Friday, February 7, 2025.  Supp. App. 891; R. Doc. 55, at 311.

If the case had been filed three months earlier, the last day of the trial would have been not February 7, 2025, but November 7, 2024—two days *after* Election Day.  And that would not have been the end of the trial court process.

41

Speaker Hansen alone listed hundreds of potential witnesses, and more than fifty exhibits, some including multiple parts such as "photos," "videos," "screenshots," and "documents." Supp. App. 892-906; R. Doc. 55, at 312-326. After the trial was concluded, the trial court would have had to write a (presumably lengthy) opinion, receive proposed findings and conclusions, receive objections to proposed findings and conclusions, then enter its own findings and conclusions. S.D.C.L. § 15-6-52(a) (court shall find the facts and state its conclusions); *Goeden v. Daum*, 668 N.W.2d 108, 110 (S.D. 2003), quoting *State v. McGarrett*, 535 N.W.2d 765, 768 (S.D. 1995) ("It is well-settled law that it is the trial court's duty to make required findings of fact, and the failure to do so constitutes reversible error.") So starting the case three months earlier would not have allowed anything to be concluded in the trial court before the election.

Third, as the district court recognized, "even if a trial would have occurred on Amendment G before the election, that does not mean the case would have reached a final resolution—appeal and all—before the election.

42

In fact, the appellate court may decline to consider the issue until after the election.  *See State ex rel. Cranmer v. Thorson*, 68 N.W. 202 (S.D. 1896) (declining to decide pre-election challenge until after the election)."  Add. 15; JApp. 464; R. Doc. 68, at 12.

The underinclusiveness doctrine bars the government from "seek[ing] to select the 'permissible subjects for public debate' and thereby to 'control . . . the search for political truth.'" *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994), quoting *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 530, 538 (1980) (ellipsis in *City of Ladue*).  As Justice Alito stated recently,"One of the reasons for heightened scrutiny is to ferret out whether the asserted reason for a challenged law or provision is actually the real reason for the provision."  *NRSC v. FEC*, No. 24-621, December 9, 2025, at 70, available at https://www.supremecourt.gov/oral_arguments/argument_ transcripts/2025/24-621_q86b.pdf (last visited December 21, 2025).

HB 1184's severe underinclusiveness reveals the unsurprising truth that it has nothing to do with its alleged rationale, and everything to do with

43

attempting to tip the scales of political debate in favor of the State and against citizens who initiate proposed laws by eliminating three months of citizen core political speech.

## D. The State's last-gasp press conference rationale was waived and lacks merit

In this appeal, the State argues an alternative reason allegedly justifying HB 1184, which it calls "the influence that any information presented at a public trial would have on an election, regardless of whether an appeal was completed prior to a vote." State's Brief at 5. The State argues that a pre-election trial allows information to be made public through "an adversarial presentation of the evidence in a public forum in advance of a measure being put to a public vote." State's Brief at 20 and 22.

As just discussed, it is doubtful that even with a nine-month deadline, the trial will be held before the general election. But regardless, the State did not argue this in the district court, so the issue is not preserved for appeal. *Kelley v. Safe Harbor Managed Account 101, Ltd.*, 31 F.4th 1058, 1066 (8th Cir. 2022); *Cole v. Int'l Union, UAW*, 533 F.3d 932, 936 (8th Cir. 2008).

44

In any event, the argument depends on unknowable factors: what the evidence is, how widely it is distributed in the media, how effective each side's media campaigns are, how the evidence might affect potential voters, etc. Theoretical, unknowable, potential public reaction to court proceedings is far too amorphous to justify suppressing three months of core political speech. The State cites no case ever suggesting any such thing.

The State says it wants to enable parties to a lawsuit to have "the opportunity to share vital information with the public through a trial prior to the election[.]" State's Brief at 20. But a party can satisfy its wish to "share vital information with the public" by holding a press conference, talking to a reporter, buying advertisements, or posting on social media. A trial is unneeded for a party to exercise its First Amendment rights.

### E.  The State waived its rabbit hole argument that something about the 2024 Amendment G litigation somehow justifies HB 1184

The State spent most of the trial arguing about why the private challenge to proposed Amendment G was not tried before the election. Each

side blamed the other. DFH presented testimony that it never engaged in any dilatory tactics or ever sought intentional delay. JApp. 546-47.

The district court thought all this was irrelevant. It said: "this is a bit of a rabbit hole. . . . I don't know that it's relevant for me to—for me to hear testimony from anyone about the—the infighting or the fighting that the attorneys had with each other about scheduling. . . . I just don't know that it's really necessary to help me decide the issue that's actually before me." JApp. 796 line 20 to 797 line 14.

The district court was correct. It was a rabbit hole. In deciding the case, the district court wrote: "during the evidentiary hearings, both parties entered into evidence thousands of pages of documents and court records related to the Life Defense Fund litigation. The parties also presented hours of testimony concerning attorney conduct and the integrity of that conduct during the Life Defense Fund litigation." Add. 15; JApp. 464; R. Doc. 68, at 12. The district court did not mention the matter again. It played no part at all in the decision.

46

Likewise, this irrelevant issue is not in the State's Brief. The State never attempts to explain how the purported attorney conduct and integrity issues—even if established and found to be true, which they assuredly were not—supposedly justify HB 1184. So this argument is waived. *SD Voice v. Noem*, 60 F.4th at 1077 n.3, quoting *United States v. Cooper*, 990 F.3d 576, 583 (8th Cir. 2021) ("Ordinarily, a party's failure to make an argument in its opening brief results in waiver of that argument.") DFH has addressed this issue here in case the State's reply brief attempts to resuscitate it.

## III. The only rational explanation for HB 1184 is the Legislature's desire to make it harder for citizens to petition for redress of grievances

Considering how successfully South Dakotans have used their right to initiate laws and constitutional amendments in recent years, it is no surprise that the Legislature seeks to claw back power from its citizens. Human beings have always struggled for power. Dakotans for Health has two petitions currently circulating that if successful will reduce the Legislature's power to change citizens' right to initiative and referendum, and to change the results of successful initiatives. JApp. 631; Supp. App. 824-25; R. Doc. 55, at 9-10. HB

47

1184 was part of a broad package of 2025 anti-initiative bills proposed by Speaker Hansen, some of which were enacted. Heidelberger, *supra*, 70 S.D. L. Rev. at 547-48.

The State argues: "South Dakota citizens take significant interest in the integrity of their elections as is clear from the sheer number of bills addressing election integrity that were introduced during the 2025 South Dakota Legislative Session. Under the subject of Elections, the South Dakota Legislative Research Council records that approximately 48 bills or joint resolutions were introduced. As to the subject of ballot measures, approximately 17 bills or joint resolutions were introduced." State's Brief at 13-14 (footnotes omitted).

But this argument contains two fundamental errors. One is that the State fails to show that any of these bills actually address "election integrity," rather than just "elections." HB 1184 regulates elections, but does nothing to improve "election integrity." The second is that the 2012 to 2025 tsunami of attempts to restrict the initiative process were not brought by *citizens*, they

48

were brought by *elected officials*, who have by their actions proved themselves bitterly opposed to citizen initiatives.  Card, *supra*, 67 S. D. L. Rev. at 342, and Heidelberger, *supra*, 70 S.D. L. Rev. at 547-48.

## IV. Strict scrutiny applies; even under lesser scrutiny, HB 1184 is unconstitutional

### A. HB 1184's ban on three months of core political speech is more than "merely inconvenient," so strict scrutiny applies and the law is unconstitutional

"If the filing deadline imposes a severe burden on the ability to engage in political speech, strict scrutiny applies.  A severe burden is one that goes 'beyond the merely inconvenient.'" *SD Voice v. Noem*, 60 F.4th at 1080, quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring) (citation omitted).  In *SD Voice v. Noem*, this Court wrote: "we harbor doubt that the burden on the ability to engage in political speech as a result of the deadline is less than severe." *Id.* at 1080.  This Court ruled: "we need not decide this issue because we conclude the statute fails under scrutiny for burdens that are less than severe." *Id.*

49

A categorical suppression of three months of political speech is more than "merely inconvenient." As this Court ruled in *SD Voice v. Noem*, an early filing deadline effectively prohibits circulating petitions after the deadline, makes it less likely the petitions will gather the signatures needed to qualify for the ballot, limits political debate, and dilutes the effectiveness of speech. 60 F.4th at 1078. By any measure, suppressing three months of core political speech is a severe burden on political expression. So strict scrutiny applies, and HB 1184 is unconstitutional. Yet here, as in *SD Voice v. Noem*, and *Dakotans for Health v. Noem*, 52 F.4th 381, 389 (8th Cir. 2022), this Court need not cross this bridge, because the statute fails lesser scrutiny as well.

**B.  HB 1184 fails even lesser scrutiny**

If strict scrutiny does not apply, the nine-month deadline is reviewed "to ensure it is reasonable, nondiscriminatory, and furthers an important regulatory interest." *SD Voice v. Noem*, 60 F.4th at 1080, quoting *Miller v. Thurston*, 967 F.3d 727, 740 (8th Cir. 2020). This review has teeth; the State may not merely assert a legitimate interest, it must establish it. *SD Voice v.*

50

*Noem*, 60 F.4th at 1081 ("South Dakota merely relies on a bare assertion of election integrity rather than evidence or a reasonable response connected to the filing deadline.")

The same is true here. The nine-month filing deadline does not survive scrutiny any more than the one-year filing deadline in *SD Voice v. Noem* survived it. South Dakota's only alleged interest—supposedly in resolving private election challenges before the election—was invented to try to justify HB 1184, and contradicts South Dakota's history and precedent, as well as South Dakota's own actions. And it is so severely underinclusive that it is impossible to credit the State's newly-invented rationale as anything but window-dressing to attempt to further the Legislature's longstanding attempts to undermine the initiative process.

## Conclusion

In our federal system, states are laboratories of democracy, operating within the guardrails of the United States Constitution. South Dakota in 1898

Appellate Case: 25-2940    Page: 61    Date Filed: 01/02/2026 Entry ID: 5593096

led the nation in an experiment in direct democracy—enabling its citizens to originate the laws they must live by—that continues today.

In HB 1184, the Legislature seeks to take political power concerning initiatives back from citizens. This is unsurprising. As Justice Gorsuch said recently: "The one thing our Framers knew is that every political actor seeks to enhance its own power. We all know that to be true from our own experiences." *Trump v. Slaughter*, No. 25-332, December 8, 2025, at 45-46, available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/ 2025/25-332_7lhn.pdf (last visited December 21, 2025).

The First Amendment requires adequate justification before a state can limit the core political speech of its citizens. HB 1184 is supported by only the flimsiest of pretextual justifications that do not justify suppressing three months of core political speech.

The district court was correct that HB 1184 is unconstitutional and should be permanently enjoined. The judgment should be affirmed.

52

Dated: January 2, 2026          Respectfully submitted,

/s/ James D. Leach
James D. Leach

### Certificate of Compliance

Pursuant to F.R.A.P. 28.1(e)(2)(B) and 32(g)(1), I certify that this brief contains 9,040 words. It has been scanned for viruses and is virus-free.

/s/ James D. Leach
James D. Leach

### Certificate of Service

I certify that on January 2, 2026, I filed this document electronically, thereby causing automatic electronic service to be made on all parties.

/s/ James D. Leach
James D. Leach

Appellate Case: 25-2940   Page: 63   Date Filed: 01/02/2026 Entry ID: 5593096