# UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

_____

No. 25-2940

_____

**DAKOTANS FOR HEALTH** and **RICK WEILAND**,

> _Plaintiffs-Appellees,_

v.

**SOUTH DAKOTA SECRETARY OF STATE MONAE JOHNSON** in her official capacity,

> _Defendant-Appellant._

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA

_____

THE HONORABLE CAMELA C. THEELER
United States District Court Judge

_____

## APPELLANT'S REPLY BRIEF

_____

MARTY J. JACKLEY
SOUTH DAKOTA ATTORNEY GENERAL
Paul S. Swedlund
SOLICITOR GENERAL
Grant M. Flynn
ASSISTANT ATTORNEY GENERAL
1302 E. Highway 1889, Suite 1
Pierre, SD 57501-8501
Telephone: 605-773-3215
E-Mail: atgservice@state.sd.us

ATTORNEYS FOR APPELLANT

_____

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................4

   1. *SD Voice* Is Not Determinative Here ...............................................5

   2. Level of Scrutiny...................................................................................7

   3. The District Court's Ruling The South Dakota Has No Regulatory Interest Here Conflicts With Apposite United States Supreme Court Authorities .......8

   4. The 9-Month Deadline Serves A Sufficiently Important State Interest ........11

CONCLUSION ..................................................................................................17

CERTIFICATE OF COMPLIANCE ...............................................................18

CERTIFICATE OF SERVICE .........................................................................18

Appellate Case: 25-2940     Page: 2     Date Filed: 01/26/2026 Entry ID: 5600879

# TABLE OF AUTHORITIES

*281 Care Committee v. Arneson,* 766 F.3d 774 (8th Cir. 2014)..................................7

*American Constitutional Law Foundation v. Meyer,*
120 F.3d 1092 (10th Cir. 1997)........................................................................6, 7

*Brnovich v. Democratic National Committee,* 141 S.Ct. 2321 (2021)....................11

*Burdick v. Takushi,* 504 U.S. 428 (1992)..................................................................6

*Crawford v. Marion County Election Board,* 553 U.S. 181 (2008) .......................11

*Dakotans for Health v. Noem,* 543 F.Supp.3d 769 (D.S.D. 2021) ..................1, 8, 14

*Dobrovolny v. Moore,* 126 F.3d 1111 (8th Cir. 1997)................................................7

*In re Election Contest of Watertown Special Referendum,* 628 N.W.2d 336
(S.D. 2001) ...............................................................................................................14

*John Doe 1 v. Reed,* 561 U.S. 186 (2010) .........................................9, 10, 11, 12, 15

*Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464 (1981) ...............13

*Miller v. Thurston,* 967 F.3d 727 (8th Cir. 2020) ...................................................5

*Org. for Black Struggle v. Ashcroft,* 978 F.3d 603 (8th Cir. 2020) ..........................7

*Purcell v. Gonzalez,* 549 U.S. 1 (2006) ...........................................................12, 15

*SD Voice v. Noem,* 60 F.4th 1071 (8th Cir. 2023) ......................................1, 5, 6, 12

*Sinner v. Jaeger,* 467 F.Supp.3d 774 (D.N.D. 2020) ...........................................6, 8

*Thom v. Barnett,* 967 N.W.2d 261 (S.D. 2021) ........................................13, 15, 16

*Timmons v. Twin Cities Area New Party,* 520 U.S. 351 (1997).................10, 11, 16

*United States v. O'Brien,* 391 U.S. 367 (1968) .......................................................13

Fla. Stat. Ann. § 100.371 ...........................................................................................1

Me. Const. Art. IV, Pt. 3, § 18 ...................................................................................1

Miss. Const. § 273.......................................................................................................1

SDCL 2-1-18................................................................................................................3

Utah Code Ann. § 20A-7-105.....................................................................................1

Appellate Case: 25-2940    Page: 3    Date Filed: 01/26/2026 Entry ID: 5600879

# INTRODUCTION

Contrary to appellees' self-serving premise that "all was well" after South Dakota adopted a 6-month deadline for the filing of initiative and referendum petitions in response to *SD Voice v. Noem,* 60 F.4th 1071 (8th Cir. 2023), which invalidated the state's previous 1-year deadline, South Dakota learned from experience that 6 months unacceptably curtails the First Amendment rights of petition opponents and thwarts full and open public dialog concerning such measures. APPELLEES' BRIEF at 14. South Dakota split the difference and enacted a 9-month petition filing deadline which appellees now challenge.[1]

Initiated and referred measures intrinsically are passion projects that often arouse over-zealous advocacy and tactics by proponents seeking to bend the political landscape to their point of view, making the petition process ripe for abuse. As documented in *Dakotans for Health v. Noem,* 543 F.Supp.3d 769, 776, 785 (D.S.D. 2021), four initiated measures were disqualified from inclusion on the ballot in 2018 due to invalidated signatures. Up to 45% of the signatures of one of the measures were invalid. *Dakotans for Health,* 543 F.Supp.3d at 776.

---

[1] Maine, Florida, Mississippi and Utah all have 9-month or more deadlines, requiring the filing of petitions in the January or February before a November election: Me. Const. Art. IV, Pt. 3, § 18 (January/February); Fla. Stat. Ann. § 100.371 (February); Miss. Const. § 273 (January); Utah Code Ann. § 20A-7-105 (February).

In the trial below, the Speaker of the South Dakota House of Representative, Jon Hansen, identified concrete instances of petition irregularities that necessitated citizen challenges at the time and are the impetus for the longer window of time in which to litigate those challenges at issue here, such as:

- People signing petitions who were not residents of South Dakota. MT at 159/20.

- Out-of-state petition signers who were renting mailboxes in the state, registering to vote at that mailbox and then voting on petitions even though they had never lived in South Dakota. MT at 159/20.

- Petition circulators who were not South Dakota residents, in violation of South Dakota law. MT at 161/6.

- Petition circulators who were not providing signers with the Attorney General's explanation of the ballot provision as required by law. MT at 174/3, 176/2-14, 197/18.

- Circulators who were using bait-and-switch tactics, *i.e.* telling voters that they were signing a petition to eliminate sales tax on groceries when they were really signing a petition to legalize abortion in the state. MT at 174/3, 176/2-14, 197/18.

- Circulators leaving petitions unattended and therefore not personally witnessing all signatures as required by law. MT at 174/3, 176/2-14, 197/18.

2

- Passage of an initiated measure (Amendment A) that violated the single-issue rule. MT at 185/1, 185/13. The resulting post-vote nullification of this measure generated "a lot of consternation" because "people felt like they were disenfranchised." MT at 185/1, 185/13.

To combat such abuses and improve public confidence in the initiative and referendum process generally, in 2018 South Dakota enacted a mechanism for citizens to challenge petitions before they are placed on the ballot. SDCL 2-1-18. These citizen challenges were necessitated by the limitations of the Secretary of State's petition verification process. Like many states, the Secretary does not review every petition signature but only a random statistical sample as low as 2.3% of petition signatures. MT at 162/1, 169/17. The Secretary's verification process alone is insufficient to identify all invalid signatures or indicia of the irregularities and abuses described above. MT at 162/1, 169/17.

Consequently, South Dakota's citizen challenge statute allows individual citizens to review every signature. MT at 162/9. This verification process exists because the state has an interest in allowing citizens in general and petition opponents in particular an opportunity "to review and challenge the validity of signatures submitted by . . . petition sponsors . . . to determine whether [an initiated] measure is lawfully on the ballot." MT at 169/21.

3

But, after the petition filing deadline was shortened from 12 to 6 months, legislators found that 6 months was "just not enough time" to litigate citizen challenges to the validity of signatures or other irregularities in the petition. MT at 166/9, 166/17, 184/22. Hence, the enactment of the 9-month deadline challenged here.

The object of the 9-month rule was to strike a balance between the First Amendment rights of both petition proponents *and* opponents by providing "a little more time on the back end to allow for a potential challenge." MT at 170/13. It was further intended to ensure "that the citizens who want to review the validity of petition signatures have the ability to do so . . . within a reasonable timeframe before the election takes place." MT at 171/5, 184/19. As discussed below, this serves the state's interest in ensuring that "measures are lawfully on the ballot," minimizing post-vote nullification, and combating voter disenfranchisement and apathy. Also, the 9-month deadline promotes grassroots democracy and federalism principles by helping "to make sure that [South Dakota's] initiative process remains a South Dakota process that's done by South Dakotans for South Dakotans." MT at 170/13.

## ARGUMENT

As Speaker Hansen described, South Dakota has encountered fraud, mistake and irregularity in the initiative and referendum process. Speaker Hansen testified as a legislator and from his experience of being unable to timely litigate a pre-vote

4

challenge to Amendment G that a 6-month deadline does not provide petition opponents sufficient time to investigate and litigate whether a measure does not belong on the ballot due to fraud, mistake or other irregularity. The 9-month deadline promotes the state's goal of reserving the ballot for measures that properly belong on it by maximizing the probability that challenges to an initiated or referred measure will be fully litigated in at least the trial courts before the vote, "meaning [the state's] interest [here] is legitimate as well as important." *Miller v. Thurston,* 967 F.3d 727, 740 (8th Cir. 2020).

However, the district court assigned little to no weight to these interests. The district court's ruling is conspicuous error because its findings that the state had no regulatory interest in citizen petition challenges, and that the state had not demonstrated that a 9-month deadline serves that interest, conflict with apposite United States Supreme Court authority. Accordingly, the district court's judgment herein should be reversed.

### 1. *SD Voice* Is Not Determinative Here

Appellees greatly exaggerate the persuasive or controlling force of *SD Voice* here. In that case, this court considered a facial challenge to South Dakota's 1-year deadline for submitting petitions to initiate statutes and amend the state constitution. *SD Voice,* 60 F.4th at 1078. Plaintiffs argued that a 1-year deadline impermissibly infringed on their interests in circulating initiative petitions.

5

The *SD Voice* court agreed, largely on the basis of the temporal remoteness of the 1-year deadline and the limitations on political expression it imposed. *SD Voice,* 60 F.4th at 1078. *SD Voice* found that South Dakota had not shown a legitimate interest in limiting that expression for one full year prior to the election. *SD Voice,* 60 F.4th at 1078.

While, on the surface, *SD Voice* addressed the same question at issue here in connection with a 1-year deadline, it takes *SD Voice* too far for appellees to insist that the same reasoning is equally fatal to a 9-month deadline for the obvious reasons that (1) a 9-month deadline is not as remote as a 1-year deadline so (2) the resulting limitations on expression and inclusion on the ballot are correspondingly less.

Thus, the fact that *SD Voice* found the 1-year deadline invalid does not *ipso facto* make the 9-month deadline invalid. *SD Voice* is not a magic bullet that absolves appellees of their burden to prove anew that the 9-month deadline is a burden rather than an inconvenience. Ballot deadlines inevitably are "barriers" that exclude some measures from being placed on the ballot, but this "does not alone invalidate a deadline." *American Constitutional Law Foundation v. Meyer,* 120 F.3d 1092, 1098-1099 (10th Cir. 1997), citing *Burdick v. Takushi,* 504 U.S. 428, 433 (1992). When all appellees have done to demonstrate that a 9-month deadline effectively excludes initiated and referred measures from the ballot is to wrap their case in *SD Voice,* they have not met their burden. *Sinner v. Jaeger,* 467 F.Supp.3d

6

774, 782-783 (D.N.D. 2020). In this case, appellees have, at best, produced evidence that the 9-month deadline makes the job of appearing on the ballot more difficult. But added difficulty does not even meet the standard of strict scrutiny let alone the deferential standard that applies here. *Dobrovolny v. Moore,* 126 F.3d 1111, 1113 (8th Cir. 1997). Appellees have not proven as they are required to do "that by planning and proper preparation" the 15 months leading up to the 9-month deadline is not "ample time to circulate petitions." *Meyer,* 120 F.3d at 1099.

As discussed below, the state's interests respecting a 9-month deadline are different from the 1-year deadline in light of the state's post-*SD Voice* experience with a 6-month deadline. Also, as discussed below, the district court's ruling in this case rests on reasoning that directly conflicts with a United States Supreme Court case.

## 2. Level Of Scrutiny

Because the district court did not find that the 9-month deadline imposed a severe burden on First Amendment rights, "the state is not required to demonstrate a *compelling* state interest."[2] *Org. for Black Struggle v. Ashcroft,* 978 F.3d 603, 608

---

[2] This court's jurisprudence reflects that appellees could not necessarily prove a severe burden in this case even if strict scrutiny applies. As this court has observed, scrutiny is strictest in regard to state efforts to "[d]irectly regulat[e] what is said or distributed during an election." *281 Care Committee v. Arneson,* 766 F.3d 774, 787 (8th Cir. 2014). The 9-month deadline does not directly or indirectly regulate what is said, what is distributed, who may say what, who may distribute what, or where it may be said or distributed. Nor does the 9-month deadline directly limit the number

7

(8th Cir. 2020).  Thus, the only question posed by the district court's opinion here is whether the state's regulatory interests in a 9-month deadline "are generally sufficient to justify . . . restrictions" on petition circulation.  *Dakotans for Health,* 543 F.Supp.3d at 779; *Sinner,* 467 F.Supp.3d at 785 (a state "holds unquestionably important interests in preventing fraud and protecting the integrity of the electoral process").  But before reaching the sufficiency of the state's interest here, it is necessary to expose the flaw at the heart of the district court's rather remarkable ruling that the state has *no* regulatory interest here at all.

### 3. The District Court's Ruling The South Dakota Has No Regulatory Interest Here Conflicts With Apposite United States Supreme Court Authorities

The district court's ruling that South Dakota has no regulatory interest here rests on two conspicuous errors of law.  First, the district court found that the state lacked a regulatory interest in citizen petition challenges because such challenges

---

of circulators permitted to convey a petition proponent's message or the size of the audience the proponent can reach, only the time in which the proponent has to reach that audience.  *281 Care Committee,* 766 F.3d at 787.  Thus, the effects on expression here are indirect and merely incidental to the time limit.  While, as appellees argue, a 9-month deadline may make it "less likely" that petition proponents can collect sufficient signatures to secure a place on the ballot, difficulty is not the touchstone of strict scrutiny.  *Dobrovolny,* 126 F.3d at 1113.  The "hallmark of a severe burden" is "exclusion or virtual exclusion from the ballot."  *Sinner,* 467 F.Supp.3d at 782-783.  A 9-month deadline by no means actually or virtually excludes an initiated or referred measure from the ballot.  By their very nature, deadlines prevent some measures from being placed on the ballot, but this fact "is insufficient by itself to require strict scrutiny."  *Meyer,* 120 F.3d at 1098.

8

are not brought by "a government actor." R.DOC. 68 at 14. Second, the district court ruled that, even if the state has a regulatory interest in allowing citizens more time to litigate petition challenges prior to an election, the state had not demonstrated that a 9-month deadline served that interest because the availability of post-vote challenges negated the necessity of pre-vote challenges. Both of these findings defy apposite United States Supreme Court authority.

With respect to the first point, the district court's determination that citizen challenges serve no *state* regulatory interest is flatly contradicted by *John Doe 1 v. Reed,* 561 U.S. 186 (2010). In *John Doe,* opponents of a referendum sought disclosure of the petitions through the state's public records access laws. Like the South Dakota citizen challenge at issue here, this was an effort undertaken entirely by "private parties," not the state. *John Doe,* 561 U.S. at 198. The *John Doe* referendum proponents opposed disclosure arguing, as appellees do here, that the public records access laws did not implicate the "interest of protecting the integrity of the electoral process" because "the Secretary of State [was] already charged with verifying and canvassing the names on a petition." *John Doe,* 561 U.S. at 198. In other words, the *John Doe* proponents took the same position as the district court here that only those processes involving "a government actor" implicated state interests. R.DOC. 68 at 14. But the *John Doe* court rejected this position and found that public access to petitions via the public records access laws served state

9

regulatory interests in the integrity of the electoral process even though such access was a purely private mechanism for challenging a referred measure. *John Doe,* 561 U.S. at 198. Thus, the district court's finding that petition enforcement mechanisms must involve "a government actor" to implicate state regulatory interests is a conspicuous error of law. R.DOC. 68 at 14; *John Doe,* 561 U.S. at 198.

With respect to the second point, the district court's failure to recognize the state's regulatory interest in citizen challenges unavoidably biased its view of how the 9-month deadline serves that interest. The district court basically held that the 9-month deadline could only serve the state's regulatory interest if citizen challenges would be resolved to "final litigation" in every case. R.DOC. 68 at 15. This is an impossible standard which assigns zero weight to the state's interest in resolving as many pre-vote citizen (or other) challenges as possible in order to minimize post-vote nullification. While post-vote challenges are a backstop against the inevitability that not *all* citizen challenges can be litigated to conclusion before an election, this fact does not eviscerate the state's interest in at least trial-court-level pre-vote adjudication of as many citizen challenges as possible. Holding the 9-month deadline to a standard of 100% efficacy in resolving pre-election litigation in every case is exactly the kind of "[e]laborate, empirical verification" that *Timmons* says states are not expected to provide to validate a regulation. *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997). Thus, the district court failed to

appreciate that the state's interests in the efficacy of pre-vote citizen (and other) challenges and minimizing post-vote nullification are sufficiently weighty to justify a moderately shorter deadline. *Timmons,* 520 U.S. at 364.

### 4. The 9-Month Deadline Serves A Sufficiently Important State Interest

The district court's notion that the 9-month deadline must be 100% effective at resolving pre-vote citizen (or other) challenges to be a valid state interest ignores the balance between proponent and opponent First Amendment rights that the legislature was trying to strike with the 9-month deadline. Proponent demands for more time necessarily come at the expense of opponent First Amendment rights, and ultimately at the expense of voter confidence in the initiative and referendum process. *Brnovich v. Democratic National Committee,* 141 S.Ct. 2321, 2345 (2021)("decreas[ing] voter confusion and increase[ing] confidence in elections" fall within scope of state interests).

The state's interest in preserving the integrity of the electoral process extends beyond "efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well." *John Doe,* 561 U.S. at 197. Thus, as recognized in *Crawford v. Marion County Election Board,* 553 U.S. 181, 197 (2008), "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." "[C]onfidence in the integrity of our electoral processes is essential to the

functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006).

Opponents cannot challenge signatures until petitions are filed. As noted in *John Doe,* even the job of conducting verification via a sample of "only 3 to 5% of signatures" as was done by the Secretary of State in that case (and similarly done by the South Dakota Secretary of State here) is a "large and difficult" process. *John Doe,* 561 U.S. at 198; *SD Voice,* 60 F.4th at 1081 (noting random sampling methodology in South Dakota examines only 2.3% of petition signatures). This process necessarily does "not catch all invalid signatures." *John Doe,* 561 U.S. at 198. Hence, South Dakota law provides petition opponents a statutory mechanism for conducting a more exacting verification process. SDCL 2-1-18; MT at 162/9.

These citizen challenges serve the state's regulatory interests in "the integrity of the electoral process" and "ferret[ing] out invalid signatures caused not by fraud but by simple mistake" by "help[ing to] cure the inadequacies of the verification and canvassing process." *John Doe,* 561 U.S. at 198. As *John Doe* points out, the task of citizen challenges is necessarily larger and more difficult because it examines *all* signatures, not just a small sample. *John Doe,* 561 U.S. at 198.

Appellate Case: 25-2940     Page: 15     Date Filed: 01/26/2026 Entry ID: 5600879

In contrast to *SD Voice's* criticism of the absence of "evidence in the record that . . . suggest[ed] that the one-year requirement lend[ed] anything of value to the state," the record here demonstrates that the 9-month deadline does add value to the state's election process. MT at 170/12.   As Speaker Hansen testified, the 9-month deadline affords more time to litigate pre-vote citizen challenges prior to the election.[3] MT at 166/9, 166/17, 184/22.

More time adds value to the process because petition proponents who compel the voting public to vote on an initiated or referred measure whose signatures or potential legal defects have not been properly vetted – as happened with Amendments A and G – ultimately undermine public confidence in the initiative and referendum process.  MT at 185/1, 185/13.  As described in *Thom v. Barnett,* 967 N.W.2d 261, 265 (S.D. 2021), some voters felt that "the placement of

---

[3] Appellees devote substantial briefing bandwidth to attacking Speaker Hansen's alleged improper motives behind enacting HB 1184.  This confuses relevant evidence of collective legislative purpose with irrelevant evidence of an individual legislator's alleged impermissible motives.  As stated in *United States v. O'Brien,* 391 U.S. 367, 383 (1968), "[i]t is a familiar practice of constitutional law that this court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."  See also *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 469 (1981)(rejecting "[i]nquiries into . . .  motives" of individual legislators when examining purpose of statute).  Thus, this court should ignore Pages 7-12 of Appellees' Brief which try to bolster Appellees' arguments by impugning Speaker Hansen's motives, as though a legislator "motivated by his political views" is incompatible with "a general interest in good government." Appellees' Brief at 10, 11.  Such character attacks have no place in the constitutional analysis.  *O'Brien,* 391 U.S. at 383

Appellate Case: 25-2940     Page: 16     Date Filed: 01/26/2026 Entry ID: 5600879

Amendment A on the ballot in violation of the constitution tainted the entire election process and resulted in an election that was not a free and fair expression of the will of the voters." *In re Election Contest of Watertown Special Referendum,* 628 N.W.2d 336, 339 (S.D. 2001). The 9-month deadline mitigates the imbalance between proponent and opponent speech created by the 6-month deadline by providing opponents with more time to determine whether an initiated or referred measure is lawfully on the ballot. MT at 169/21, 170/13.

The district court's position that the existence of post-vote challenges negates any benefit from or necessity for adjudicating as many pre-vote challenges before an election as possible in order to minimize post-vote nullification gives no weight at all to this state interest. None! This is flat wrong under apposite authorities.

Indeed, according to a 2021 poll taken in the thick of the Amendment A campaign, only 74.8% of South Dakota voters believed that ballot initiatives are an important part of the democratic process. *Dakotans for Health,* 543 F.Supp.3d 769 at 794 n. 10. While not an alarming number, in school a 74 would be a C grade, meaning that South Dakota had some work to do in the wake of Amendment A's post-vote nullification to improve voter confidence in the initiative and referendum system. MT at 185/1, 185/13. The 9-month deadline was enacted for the very purpose of minimizing post-vote nullification and repairing voter confidence by giving citizen petition challenges additional time to "ensure that the only signatures

counted are those that should be" and to "root out" other defects in an initiated or referred measure before it is put on the ballot. *John Doe,* 561 U.S. at 197, 199.

Public confidence in the system suffers when an aura of futility develops around the initiative and referendum process. What's the use of circulating, what's the use of engaging with circulators, what's the use of signing, what's the use of educating oneself about initiated measures, what's the use of taking the time in the voting booth to read ponderous ballot explanations in order to cast an informed vote if a measure should not have been on the ballot in the place? The public's perception of the initiative and referendum process will inexorably devolve into cynicism in consequence of repeated post-vote nullifications of ballot measures. *Thom,* 967 N.W.2d at 265; *Purcell,* 549 U.S. at 4. Public confidence and willingness to engage in the initiative and referendum process necessitates reasonable assurances to voters that a measure is properly on the ballot.

Appellees disparage the mitigating effect of pre-vote litigation on the inconvenience of a shorter deadline. APPELLEES' BRIEF at 26. According to appellees, the state's pre-vote litigation justification "is suspect from the get-go" because it was not previously raised in *SD Voice.* APPELLEES' BRIEF at 15. This ignores the obvious reality that conducting timely pre-vote litigation was not as much of a problem before the filing deadline was cut in half. So, it is rich that, having newly created a problem with their 6-month deadline, appellees now mock

the state's effort to address the problem as a "newly discovered alleged interest." APPELLEES' BRIEF at 15.

Appellees' disdain for pre-vote litigation disregards the obvious reality that the adversarial process of litigation is an excellent vehicle for proponents and opponents alike to educate the public on the existence and merits of initiated and referred measures that will appear on the ballot in the upcoming election. Media reports on the trial arguments for and against a ballot measure help inform the public about the substantive merits of a ballot measure, the community impact of its adoption or rejection, as well as potential legal defects of form or process that influence a voter's decision to support or oppose a ballot measure. Such legal challenges can exert their influence on an election only if they are allowed to play out prior to the election.

Contrary to the district court's belief that the availability of post-election challenges cancels out the state's interest in finalizing as much pre-vote litigation as possible, post-vote nullification is not a satisfactory remedy because it "taints" the initiative and referendum process and leaves voters feeling "disenfranchised." MT at 185/1, 185/13; *Thom,* 967 N.W.2d at 265; *Purcell,* 549 U.S. at 4. These regulatory interests are "sufficiently weighty to justify" a shorter deadline. *Timmons,* 520 U.S. at 364.

Appellate Case: 25-2940     Page: 19     Date Filed: 01/26/2026 Entry ID: 5600879

**CONCLUSION**

The district court's ruling that the state has *no* regulatory interest in improving the efficacy of citizen challenges is in direct conflict with *John Doe,* and the "elaborate, empirical verifications" for the 9-month deadline the district court demanded from the state are in direct conflict with *Timmons.* No sustainable ruling can result from such glaring errors of law. The state has shown that its regulatory interests in promoting the efficacy of citizen challenges, ensuring that initiated and referred measures are lawfully on the ballot, minimizing post-vote nullification, preventing systemic harms, and inspiring voter confidence in elections justify the inconvenience the 9-month deadline may impose. But appellees have failed altogether to show that no planning and proper preparation will enable them to meet the 9-month deadline. Accordingly, the district court's judgment herein must be reversed.

Dated this 23rd day of January 2026.

Respectfully submitted,

**MARTY J. JACKLEY**
**ATTORNEY GENERAL**

*/s/ Paul S. Swedlund*

Paul S. Swedlund
SOLICITOR GENERAL
Grant M. Flynn
ASSISTANT ATTORNEY GENERAL
1302 E. Highway 1889, Suite 1
Pierre, SD 57501-8501
Telephone: 605-773-3215
E-Mail: atgservice@state.sd.us

17

## CERTIFICATE OF COMPLIANCE

The State of South Dakota, by and through its counsel, Paul S. Swedlund, hereby certifies that this document complies with the type/volume limit of Fed.R.App.P. 32(a)(7)(b). It contains 4,121 words and complies with the typeface and type style requirements of Fed.R.App.P. 32(a)(5)/(a)(6). It has been printed in a proportionally-spaced typeface in 14-point Times New Roman font and scanned for viruses using Symantic Endpoint Protection.

*/s/ Paul S. Swedlund*

Paul S. Swedlund
Solicitor General

## CERTIFICATE OF SERVICE

The State of South Dakota, by and through its counsel, Paul S. Swedlund, hereby certifies that the foregoing appellant's reply brief was served on appellees' counsel via CM/ECF by electronic filing of the foregoing brief with the clerk of this court this 23rd day of January 2026.

*/s/ Paul S. Swedlund*

Paul S. Swedlund
Solicitor General

Appellate Case: 25-2940     Page: 21     Date Filed: 01/26/2026 Entry ID: 5600879